Filed 1/28/25  Madrigal v. Raincross Pub and Restaurant CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

|  |  |
|---|---|
| MATTHEW MADRIGAL,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>RAINCROSS PUB AND RESTAURANT,<br><br>    Defendant and Respondent. | D083413<br><br><br>(Super. Ct. No. RIC2002182) |

APPEAL from a judgment of the Superior Court of Riverside County, Irma Poole Asberry, Judge.  Reversed.

McCune Law Group, Brynna D. Popka, Cory R. Weck, Steven A. Haskins and Andrew W. Van Ligten for Plaintiff and Appellant.

Wood, Smith, Henning & Berman, Keith E. Smith and Steven R. Disharoon for Defendant and Respondent.

Matthew Madrigal appeals a summary judgment entered against him in his lawsuit against Raincross Pub and Restaurant, LLC., et al., formerly known as Romano's, Downtown LLC (Raincross), which operates an establishment in downtown Riverside, California.  The court found there

were no triable issues of material fact regarding Madrigal's allegations that Raincross: negligently failed to properly select, train, and supervise its security guard employees; negligently failed to protect him from an assault by a security guard; and was vicariously liable for the assault and battery.

Madrigal contends he presented evidence raising triable issues of material fact regarding whether Raincross (1) employed the security guard and (2) acted negligently by failing to select, train or supervise the guard. We reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[1]

*Madrigal's Complaint*

Madrigal alleged three causes of action against Raincross: failure to properly select, train and supervise a security guard employee; negligence; and assault and battery. He also alleged an intentional assault cause of action against an individual security guard named Sione Kiteau Kauvaka. He alleged there were Doe defendants, but did not name as a defendant Samson Taufaao, who was in charge of providing security for Raincross.

Madrigal alleged that in May 2018, he went to Raincross's and "was severely beaten and robbed by an on-duty security [g]uard employed by [Raincross] Pub." He alleged he was "knocked unconscious causing serious brain damage requiring several days of hospitalization."

Madrigal alleged Raincross had the power and authority to " 'discharge and reassign [its employees] who were, or were believed to be, emotionally unstable, untrustworthy, and/or prone to using unreasonable or excessive force, or who otherwise exhibited tendencies, traits of character, behavior,

---

[1]    Because this is an appeal from a summary judgment, we state the facts in the light most favorable to Madrigal as the losing party below. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

2

habits, conduct and/or attitudes which rendered such personnel unfit or undesirable for the positions of security officers assigned to supervise patrons of '[Raincross's].' " (Some capitalization omitted.) Further, Raincross knew, or in the exercise of reasonable care should have known, that Kauvaka was such an employee. Madrigal alleged Raincross failed to implement policies and procedures for the meaningful reporting, monitoring, investigation and disciplining of those security guards involved in misconduct. According to Madrigal, Raincross breached its duty to him and thus negligently and carelessly allowed Kauvaka, while in the course and scope of his employment, to violently assault him, causing his injuries. Madrigal sought punitive damages.

*Summary Judgment Motion*

Raincross moved for summary judgment or in the alternative summary adjudication, arguing that starting in 2017, it entered into an independent contractor relationship with Taufaao, who was duly licensed, to provide security at the venue as needed. Raincross claimed Taufaao was solely responsible for selecting the security staff, determining their shifts in advance, and paying them at the end of each shift. Raincross asserted Taufaao and his security guards, including Kauvaka, have never been its employees.

Raincross stated that on the night of the incident, it hosted a music event starting at 9:00 p.m. and ending at approximately 12:00 a.m. Raincross claimed the altercation occurred in front of an adjacent bar about two hours after Kauvaka's shift ended; therefore, it was not directly or vicariously liable for the assault.

Raincross contended Madrigal could not prove Kauvaka was its agent or employee for purposes of establishing assault and battery liability as it did

3

not employ him. It maintained that because Madrigal had insulted Kauvaka, the incident between them was personal and not engendered by Kauvaka's employment. Raincross argued no evidence of malice, fraud or oppression supported punitive damages.

Raincross further argued the negligence cause of action failed as a matter of law because Kauvaka was off duty at the time of the incident, which occurred outside of Raincross's premises; therefore, Madrigal could not establish Raincross owed him a duty, whose breach caused his injuries. Raincross added that as it did not employ Kauvaka, it was not foreseeable to it that he was unfit for the job or exhibited any propensity for violence. Further, Taufaao did not put it on notice that Kauvaka had such a propensity. Raincross claimed it relied on Taufaao's expertise in selecting security staff. It also argued that earlier that night, during the course of his job, Kauvaka had interacted with Madrigal and his friends without using physical violence. Raincross contended Kauvaka's actions were "so unexpected and unforeseeable that [it] could not have prevented this [i]ncident through reasonable care."

Taufaao stated in a declaration, "I am a sole proprietor and independent contractor of security guard staffing for [Raincross]." He stated he was licensed with the California Department of Consumer Affairs–Bureau of Security and Investigative Services (BSIS).[2] He was solely responsible for selecting, overseeing and supervising Raincross's security personnel. Taufaao stated Raincross paid him in advance for his services, and he selected the security guards, including Kauvaka, whom he hired as an

---

[2] Madrigal's attorney represented in a deposition that BSIS "is the agency that gives guard cards and monitors the licensing, licensing details for private security officers and other security guards too."

independent contractor to work at the music event. Taufaao did not use formal timesheets for scheduling the security staff for the event because he knew when it started and ended, and paid the staff appropriately. After Kauvaka's shift ended at midnight, Taufaao paid him, and Kauvaka was "off the clock." Taufaao declared that neither he nor Kauvaka has ever been a Raincross employee.

Raincross's facilities manager, David Ludden—designated as Raincross's person most knowledgeable about its security contracts, customer safety procedures and the incident—stated in a declaration that Raincross never has employed Taufaao and his employees, including Kauvaka. Rather, Taufaao was an independent contractor who at his sole discretion selected and hired Kauvaka for the event. Ludden stated: "When the [m]usic [e]vent ended at approximately 12:00 a.m., patrons were directed to leave the second-floor of the premises . . . but patrons can stay and enjoy themselves at the ground-floor pub area until the pub closes at 2:00 a.m. [¶] . . . Kauvaka was not performing any security staffing work on the ground-floor pub on th[at] night." Ludden also stated: "Raincross had no prior knowledge or reason to know Kauvaka had any history of violent or aggressive behavior. No prior complaints were ever made to Raincross relating to Kauvaka."

Raincross's attorney in a declaration authenticated exhibits, including Madrigal's complaint and his discovery responses as well as those of Kauvaka.

*Opposition to Summary Judgment*

Madrigal opposed Raincross's motion, arguing triable issues of material fact existed regarding whether Kauvaka was working on its behalf when the incident occurred. Madrigal relied on Kauvaka's sworn statements and surveillance videos that Madrigal submitted into evidence. The videos

5

showed the incident occurred at approximately 1:53 a.m. Kauvaka testified in his deposition that he worked as a bouncer only at Romano's. His job consisted of "[j]ust roaming." He was paid by the hour in cash at the end of each night. On the night of the incident, he got off work at 2:00 a.m.

In discovery, Kauvaka was asked whether at the time of the incident he was "acting as an agent or employee for any person." (Capitalization omitted.) Kauvaka replied he "was operating in the course and scope of his employment as a bouncer at Romano's, however, [his] shift had ended by the time the incident took place." He recounted in detail the incident's origin: Madrigal and his friends repeatedly harassed him during the night. At approximately 1:00 a.m., Madrigal and his friends all appeared to be intoxicated. They were in the bathroom of the second-floor entertainment venue, despite the fact that floor had been closed since 12:00 a.m. Kauvaka told them to go downstairs but they refused and began taunting and harassing him with insulting names, swear words, and other outrageous comments. Afterwards, Kauvaka learned that Madrigal was trying to break into Raincross's storage room. Kauvaka had to escort Madrigal and his friends out of the establishment while they insulted him with angry, derogatory comments.

Kauvaka testified that just before the assault, when it was "past 2[:00 a.m.]," and he was leaving the establishment to go home, he told Madrigal and his friends to leave an area near a side door of the premises. According to Kauvaka, shortly afterwards, Madrigal and his friends approached him from different angles and resumed insulting him. Kauvaka felt physically threatened and feared for his safety. He punched Madrigal's face in self-defense, causing Madrigal to fall backward onto the ground. Kauvaka returned to Raincross for safety.

6

Madrigal argued Raincross was actually Kauvaka's employer, emphasizing it produced no written evidence of any contract with Taufaao for security services; rather, it entered into a "handshake deal" with him. Madrigal further claimed triable issues of material fact existed as to whether Raincross was directly liable as a landowner, and alternatively, as a bar that serves its patrons alcohol, and thus owed him a duty to exercise reasonable care to protect him from injury under the special relationship doctrine. Madrigal argued it was foreseeable he would suffer an injury because "it is a commonly[-]known tendency that a security guard may get into an altercation with a bar patron, an attack in this context is a foreseeable event, and [his] injuries [were] likely to occur in the absence of adequate safeguards."

Madrigal relied on Ludden's deposition testimony in which he was asked whether Taufaao had a security guard company. He replied, "I believe he has some type of company. I don't know to what extent the company—if it's licensed and bonded and all that[;] I don't know any of that information." Ludden testified he did not know the name of Taufaao's company. He was asked if Raincross had an actual contract for security services with Taufaao and his company, and Ludden replied, "There was none. It was a handshake kind of deal." He elaborated on their informal arrangement: "We talked to [Taufaao]. He went and got us security for the night of the event. And [Raincross and Taufaao] had an hourly rate . . . that we would pay security in cash at the end of the night."

Ludden was asked, "How would [Taufaao] know how many security guards he would need to bring to a location on a particular night?" Ludden replied, "Based on presale, [Raincross's owner or manager] would . . . look at the presale a day or two before and let . . . [Taufaao] know how many guards

7

that they needed." Ludden was asked, "Did [Raincross] do anything to investigate the background of any of the security guards working at its location?" He responded, "No. We assumed that they had guard cards. And in order to get one of those, you had to go through a background check."

Asked if Taufaao was required to be at the venue while his security guards were working, Ludden replied, "I don't think he was required, but he was there the majority of the time." Ludden testified the security guards "were paid cash every night at the end of the shift" by either "[t]he closing bartender or [Raincross's general manager], if he was on site." Ludden testified the security guards' job was to make sure the customers had identification on them, when there were concerts to pat them down using a metal detector wand, and to address any incidents that might arise between customers. Asked about Raincross's "policy and procedure if an injury occurs to a customer," Ludden replied, "They're supposed to do an incident report. They had incident reports on site that they would fill out and get any witnesses to write up their own, what they witnessed on that particular incident."

Relying in part on the declaration of Scott Defoe, a designated security expert, Madrigal argued Raincross owed him a duty of care which it breached by failing to act reasonably to prevent his injuries. Madrigal also argued the incident likely would not have occurred if Raincross had either properly trained and supervised its security guards or investigated their criminal background and employment history. Madrigal contended Raincross's negligent conduct caused his injuries.

Madrigal reasserted that Raincross employed Kauvaka and Taufaao, and argued it did not use reasonable care in training or investigating Taufaao before entering into a business relationship with him. He pointed to evidence

8

that Kauvaka had prior felony charges for hit and run, causing great bodily injury, and assault with a deadly weapon. Madrigal also claimed Raincross was negligent in hiring, supervising, training and retaining Taufaao's security services.

Madrigal argued triable issues of material fact existed regarding whether Kauvaka was Raincross's agent or employee and thus liable for his intentional assault and battery. Madrigal acknowledged the incident occurred "mere feet away from the front gate of [Raincross's]," but argued: "[t]he security supervisor watched the incident from his post and even admitted to investigating law enforcement that 'he knew Kauvaka had gone over there and was upset with the customers.'" Madrigal claimed, "By failing to take any action to investigate, repudiate, or respond to charges that Kauvaka committed an assault and battery, [Raincross] has ratified [his] actions. Accordingly, [it] is vicariously liable for the intentional torts of Kauvaka through the doctrine of respondeat superior."

Madrigal's attorney in a declaration authenticated documentary exhibits including transcripts of deposition of Ludden, Kauvaka and a Riverside police detective, a police report, discovery responses, declarations, including by Defoe, and surveillance videos.

*The Court's Ruling*[3]

In addressing the critical issue of whether Kauvaka was a Raincross employee or an independent contractor, the court ruled Raincross met its burden to show it did not employ Kauvaka via the declarations stating Kauvaka and Taufaao were independent contractors and Raincross had never employed either one. It ruled the burden then shifted to Madrigal to raise triable issues of material fact about their employment status. The court pointed out Madrigal "assert[ed] that the following facts reflect a triable issue of material fact regarding whether Kauvaka was [Raincross's] employee: (1) [ ] Kauvaka testified that he worked as a security officer for [Raincross]; (2) [h]e also admitted to the investigating law enforcement officers that he worked for [Raincross]; (3) [h]e did not provide security services for any other entity aside from [Raincross]; (4) [l]aw enforcement officers testified that Kauvaka worked for [Raincross]; (5) [Raincross's representative] testified in sworn discovery that Kauvaka was working at the time of the incident."

However, the court concluded Madrigal's evidence did not raise a triable issue of material fact disputing Raincross's claim Kauvaka was an independent contractor: "There is no dispute that on the morning in question Kauvaka was 'working' as a security officer for [Raincross]. That fact does not contradict [Raincross's], Kauvaka's and Taufaao's position that at that

---

[3]     Based on Raincross's objection to Defoe's declaration, the court excluded the declaration as not being a proper subject for expert evidence. Although the court stated in its minute order it "overruled" the objection to Defoe's declaration, it is clear from the context that is a typographical error. The court specifically stated: "The subject for which [ ] Defoe opines [*sic*] is not the basis for expert opinion as the issues are all within the experience of persons of common education regarding whether Kauvaka was acting in the course and scope of his employment as a bouncer and whether he was properly screened, trained and supervised as a bouncer." On appeal, Madrigal does not challenge this and other evidentiary rulings.

time his work was not being conducted as an employee of [Raincross's]. The fact that Kauvaka only acted as a bouncer for Taufaao at [Raincross's] also does not raise a triable issue of material fact regarding whether or not Kauvaka was [Raincross's] employee." The court concluded the testimony from the law enforcement officers regarding Kauvaka's employment status also did not create a triable issue of material fact. Thus, it summarily adjudicated the cause of action for failure to properly select, train and supervise employees cause of action against Madrigal.

Relying on that same reasoning, the court also summarily adjudicated the assault and battery cause of action in Raincross's favor: "Here, the assault and battery was committed by Kauvaka and Raincross may not be held vicariously liable for such conduct. The hirer of an independent contractor is not liable for the torts of the independent contractor."

The court summarily adjudicated the negligence cause of action against Madrigal, finding he had presented no evidence Raincross had any liability as a bar owner. It also found Madigral did not present triable issues of material fact to support his claim that under the "special relationship" doctrine, Raincross had a duty to control or manage the city-owned sidewalk between Raincross's and the adjacent business where the assault occurred. The court reasoned there was no evidence of heightened foreseeability. Moreover, Madrigal had not designated Taufaao or his security guard company as defendants.

## DISCUSSION

### I. *Kauvaka's Employment Status*

A. *Madrigal's Contentions*

Relying on *S.G. Borello, Inc. & Sons v. Department of Industrial Relations* (1989) 48 Cal.3d 341 (*Borello*), Madrigal contends he presented

11

evidence raising triable issues of material fact regarding whether Raincross employed Kauvaka, as it "retained control over [his] work in a relationship bearing all the hallmarks of a traditional employer-employee relationship." Based on Ludden's deposition testimony, Madrigal argues "[Raincross] determined the guard's job duties—checking [identification], doing pat-downs, and doing metal detector checks when the circumstances required them. . . . [It] dictated the amount of guards on duty and dictated the hours of the shifts. . . . [It] also required its security guards to fill out incident reports, including witness statements, in the event of injuries or other incidents. . . . [It] claims it 'requires' its security guards to have guard cards. . . . Finally, [it] admits it has the legal right to establish a security manual dictating the policies and procedures of its security personnel."

Madrigal adds that several secondary indicia of Raincross's control exist, as it: exclusively engaged Kauvaka in regular shifts; employed him per shift rather than per task; compensated him hourly; and incorporated security as a part of its regular business. Further, Kauvaka's work did not require particular skill. Madrigal concludes the court erroneously relied solely on Raincross's and Kauvaka's labeling of their relationship as being that of an independent contractor.

B. *Standard of Review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) A defendant moving for summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that [the defendant] is entitled to judgment as a matter of law." (*Id.* at p. 850.) To meet that

12

burden, a defendant must show that one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. (*Ibid.*; Code Civ. Proc., § 437c, subd. (p)(2).)

"There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850.) If the defendant does not present sufficient evidence to meet its initial burden, the trial court must deny the motion for summary judgment. (*Ibid.*) If the defendant meets its initial burden of production, the burden shifts to the plaintiff to set forth specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto. (*Id.* at p. 849.) If the plaintiff meets that burden, summary judgment should be denied. (*Gaggero v. Yura* (2003) 108 Cal.App.4th 884, 889.) If not, summary judgment for the defendant is appropriate. (*Ibid.*)

On appeal, we review the trial court's ruling on a motion for summary judgment de novo, liberally construing the evidence in favor of the party opposing the motion for summary judgment, and resolving in favor of that party all doubts as to whether any triable issue of material fact exists. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460; *Guess v. Bernhardson* (2015) 242 Cal.App.4th 820, 826.)

C. *Law Regarding Employees and Independent Contractors*

Under the doctrine of respondeat superior, an "employer may be [vicariously] liable for the torts its employee commits while acting within the scope of . . . employment." (*Yamaguchi v. Harnsmut* (2003) 106 Cal.App.4th 472, 481.) " 'Employee[s]' include most persons 'in the service of an employer

13

under any . . . contract of hire' . . . , but do not include independent contractors." (*Borello, supra,* 48 Cal.3d at p. 349.)

"The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." (*Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 946; see also *Borello, supra,* 48 Cal.3d at p. 350.) The issue of who retains the right to control the manner and means of accomplishing a desired result from the worker is important for determining the worker's status as an employee or an independent contractor. When applying the control test, what matters "is not how much control a hirer exercises, but how much control the hirer retains the right to exercise." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 533, italics omitted.) For example, " 'the right to discharge at will, without cause,' " is " '[s]trong evidence in support of an employment relationship.' " (*Borello, supra,* 48 Cal.3d at p. 350.) However, no rigid test governs whether someone is an employee. (*Arzate v. Bridge Terminal Transport, Inc.* (2011) 192 Cal.App.4th 419, 426.) "[W]hile the right to control work details 'is the "most important" or "most significant" consideration, the authorities also endorse several "secondary" indicia of the nature of a service relationship.' " (*Id.* at p. 426.)

Secondary factors to evaluate an employment relationship include: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for

14

which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Borello, supra,* 48 Cal.3d at p. 351.)

"The determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences." (*Borello, supra,* 48 Cal.3d at p. 349.) The question is one of law if the evidence is undisputed. (*Ibid.*)

D. *Analysis*

Madrigal raised triable issues of material fact regarding whether Taufaao was an employee or an independent contractor. Specifically, despite Ludden being designated as the person most knowledgeable about the matter of Raincross's security contracts with Taufaao, he testified Raincross had no written contracts with Taufaao; rather, there was an informal "handshake deal" between Raincross's owner and Taufaao. Ludden also testified he was unsure whether Taufaao even had a company, or whether it was bonded. A reasonable factfinder could conclude that the issue of security is paramount for an entertainment establishment that serves alcohol; therefore, the absence of a written contract for the employment of security guards might suffice to raise questions regarding whether Taufaao in fact operated independently in hiring, training and supervising the security guards or whether Raincross ultimately retained control over the guards as employees.

Additionally, Taufaao declared he did not utilize formal timesheets for scheduling the security staff's work hours. Relatedly, Taufaao and Ludden declared Kauvaka's shift ended at 12:00 a.m. on the night of the incident. But Madrigal disputed this by pointing to Kauvaka's testimony he was

15

working until 2:00 a.m. Such discrepancy raises an issue of whether Kauvaka was working, as a Raincross employee, when the incident occurred.

Similarly, Ludden testified Taufaao is not always on site to supervise Kauvaka. This leaves open the question of who, if anyone, supervised Kauvaka at those times, and raises the triable issue of fact regarding whether another Raincross manager took on that responsibility at those times. Further, Ludden's testimony permits an inference the security guards were responsible for preparing incident reports, thus indicating Raincross retained some control over the security guards' work and they were employees rather than independent contractors.

Case law provides that the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because " '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' " (*Ayala v. Antelope Valley Newspapers, Inc., supra,* 59 Cal.4th at p. 531.) Madrigal claims Ludden in his deposition "recognized [Raincross's] authority to fire [ ] Kauvaka, going so far to say [he] would no longer be hired as a security guard and [Raincross] could terminate any security guard who lacked the 'guard card' [Raincross] now required of its security guards." Ludden was asked in his deposition, "[K]nowing what you know now, would [Kauvaka] still be welcome to provide security services at [Raincross]?" Ludden replied, "No," and explained, "[Kauvaka] was not a licensed . . . or come to find out, I don't know if he has a guard card or not. But we require everybody to have a guard card now." In light of the fact we liberally construe the evidence in favor of Madrigal, we think his interpretation of Ludden's testimony is reasonable.

The *Borello* secondary indicia also favor a finding there was an employment relationship. Kauvaka described his duties as a bouncer as "just

16

roaming." Ludden testified it involved checking identification and using a wand to detect metal. Accordingly, the security guards' work does not appear to involve specialized skills. Further, the record also establishes that Kauvaka worked only for Raincross, and was paid hourly at the end of each shift, and in cash, by either the restaurant's closing bartender or the manager on duty.

The court gave great weight to declarations by Ludden and Taufaao stating Raincross did not employ either Taufaao or Kauvaka, who were instead independent contractors. However, the court in *Borello* recognized that "[t]he label placed by the parties on their relationship is not dispositive." (*Borello*, *supra*, 48 Cal.3d at p. 349.) In fact, courts ignore the parties' characterization if, as here, their actual conduct establishes a different relationship. (*Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 10-11.)

Raincross argues that even if Madrigal raised a triable issue of material fact as to Kauvaka's employment, Kauvaka's conduct was outside the scope of the same because "Kauvaka was finished with his work, covered his uniform, and was walking on the public sidewalk when, due to personal compulsion, he unreasonably reacted to a verbal assault with a physical one." Raincross concludes, "Therefore, all claims predicated on an employment relationship were properly dismissed."

The scope of employment has been interpreted broadly in California under the respondeat superior doctrine. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004.) "For example, '[t]he fact that an employee is not engaged in the ultimate object of his employment at the time of his wrongful act does not preclude attribution of liability to an employer.' [Citation.] Thus, acts necessary to the comfort, convenience, health, and

17

welfare of the employee while at work, though strictly personal and not acts of service, do not take the employee outside the scope of employment." (*Ibid.*) Even so, "the law is clear that an employer is not strictly liable for all actions of its employees during working hours. Significantly, an employer will not be held vicariously liable for an employee's malicious or tortious conduct if the employee substantially deviates from the employment duties for personal purposes. [Citations.] Thus, if the employee 'inflicts an injury out of personal malice, not engendered by the employment' [citation] or acts out of 'personal malice unconnected with the employment' [citation], or if the misconduct is not an 'outgrowth' of the employment [citation], the employee is not acting within the scope of employment." (*Id.* at pp. 1004-1005, italics omitted.) As the Supreme Court held in *Farmers*, " ' "where the employee is combining his own business with that of his employer, or attending to both at substantially the same time, no nice inquiry will be made as to which business he was actually engaged in at the time of injury, unless it clearly appears that neither directly nor indirectly could he have been serving his employer." ' " (*Ibid.*)

In light of Kauvaka's own interrogatory response and deposition testimony that the incident started on Raincross's premises, and earlier in the night while he was still working, Madrigal raised a triable issue of material fact regarding whether this was exclusively a personal matter. Regarding stressful relations that ordinarily occur among employees rather than an outgrowth of personal causes, the California Supreme Court has stated, "Flare-ups, frustrations, and disagreements among employees are commonplace in the workplace and may lead to 'physical act[s] of aggression.' " (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1009; see *Carr v. Wm. C. Crowell Co.* (1946) 28 Cal.2d 652, 656.) A Court of

18

Appeal has extended that analysis to apply to the risk of violence between an employee and a customer:  "The workplace stresses and strains which might cause an employee to erupt in anger are not dependent upon whether the person who happens to be standing in the line of fire is a coworker or a retail customer." (*Flores v. AutoZone West, Inc.* (2008) 161 Cal.App.4th 373, 381.) Thus, this issue is not amenable to summary adjudication because a factfinder could reasonably believe that Kauvaka was acting within the scope of his employment during all the altercations, and the issue was not personal.

## II. *Negligence Cause of Action*

Madrigal contends he raised triable issues of material fact regarding Raincross's duty owed to him, as it hired security guards in the first place, thus assuming a special duty to protect him.  He contends Raincross was negligent in hiring, training, retaining, and supervising the security guards because it did not reasonably inquire about Taufaao's or Kauvaka's backgrounds.  He specifically contends Raincross "could not identify whether [ ] Taufaao operated a company, much less whether it was licensed or bonded. . . .  No background checks were performed.  [Raincross] was aware that [ ] Taufaao had a 'guard card' of his own but made no inquiry into whether any of the other guards stationed at [Raincross]  had guard cards."  Madrigal next argues Raincross was a proprietor, and Madrigal was an invitee upon its public land; therefore, it owed a special duty to him for the security guards to reasonably protect customers on the premises.  A third source of special duty is that Romano's served its patrons alcohol.  Madrigal also contends he raised triable issues of material fact regarding Raincross's breach of its duty, causation, and damages.

Raincross responds that it "had no legal duty to protect against Kauvaka's assault [as] [t]he incident indisputably occurred on the public

19

sidewalk, and neither in the establishment nor in any parking lot [it] maintained." Furthermore, as Kauvaka committed the assault after he was finished working for the night, he "was 'in effect, [a] private third part[y]' with respect to the incident, even if there had been a triable issue as to employment."

## A. *Applicable Law*

A plaintiff in a negligence suit must demonstrate " 'a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury.' " (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083.) The general rule governing duty is set forth in Civil Code section 1714, which provides: "Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . ." (Civ. Code*,* § 1714, subd. (a).) "In a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 215.) "A duty to control, warn, or protect may be based on the defendant's relationship with 'either the person whose conduct needs to be controlled or [with] . . . the foreseeable victim of that conduct.' [Citations.] Specifically, a duty to control may arise if the defendant has a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619.)

This court has recognized a special relationship between security guards and a business's patrons: "By contracting with the business to provide security services, the security guard creates a special relationship

20

between himself and the business's customers. This relationship, in and of itself, is sufficient to impose on the guard the obligation to act affirmatively to protect customers while they are on the business premises." (*Marois v. Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 199.) "[A] security guard hired by the business should be liable to an injured customer where the guard fails to act as would a reasonable security guard under similar circumstances and that failure causes . . . injury." (*Ibid.*) The business which hires the security guard may be liable for its failure to hire a competent security guard. (*Ibid.;* see *Balard v. Bassman Event Security, Inc.* (1989) 210 Cal.App.3d 243, 247.)

B. *Analysis*

We only need address the element of duty regarding the negligence cause of action, and that is a matter of law for a court to decide. (See *Rattagan v. Uber Technologies, Inc.* (2024) 17 Cal.5th 1, 28; *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1004 [" '[T]he existence and scope' of the defendant's duty is [a question] of law to be decided by the court, not by a jury, and therefore it generally is 'amenable to resolution by summary judgment' "].) The parties sharply disagreed about whether Raincross owed a duty of care to Madigral, leading the court to find Raincross and Madigral did not have a special relationship giving rise to Raincross's duty to protect Madigral from Kauvaka's assault.

Raincross argues the incident occurred not on its premises but in front of the adjacent premises; therefore it owed no duty to Madrigal. But it is not dispositive that the incident occurred next door to Raincross as the California Supreme Court has stated: "We have never held that the physical or spatial boundaries of a property define the scope of a landowner's liability. The Courts of Appeal have repeatedly concluded that ' "[a] landowner's duty of

21

care to avoid exposing others to a risk of injury is not limited to injuries that occur on premises owned or controlled by the landowner." ' [Citations.] 'Rather, the duty of care encompasses a duty to avoid exposing persons to risks of injury that occur off site if the landowner's property is maintained in such a manner as to expose persons to an unreasonable risk of injury offsite.' " (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1156, 1159 [holding that a defendant had a duty of ordinary care to prevent its employees from taking home asbestos and exposing their family members to it].)

The assault here occurred adjacent to Raincross, and immediately after Kauvaka, who by his own admission was working at his job "past" 2:00 a.m. was trying to close the gate because the venue was closed. It therefore was a continuation of Kauvaka's confrontations with Madrigal and his friends that started earlier in the night. We conclude that under this evidence, "a security guard hired by the business should be liable to an injured customer where the guard fails to act as would a reasonable security guard under similar circumstances and that failure causes . . . injury." (*Marois v. Royal Investigation & Patrol, Inc., supra,* 162 Cal.App.3d at p. 199.)

Raincross contends Madrigal was required to show a "heightened foreseeability" in the form of prior similar criminal incidents, and failed to do so. It relies on *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, in which the court stated, "Heightened foreseeability is satisfied by a showing of prior *similar* criminal incidents (or other indications of a reasonably foreseeable risk of violent assaults in that location) and does not require a showing of prior *nearly identical* criminal incidents." (*Id.* at p. 245.) In that case, the court concluded there was insufficient evidence of heightened foreseeability but explained, "the absence of heightened foreseeability . . . merely signifies

22

that defendant owed no special-relationship-based duty to provide guards or undertake other similarly burdensome preventative measures; it does not signify that defendant owed no *other* special-relationship-based duty to plaintiff, such as a duty to respond to events unfolding in its presence by undertaking reasonable, relatively simple, and minimally burdensome measures. Indeed, the record clearly establishes the existence of such a minimally burdensome duty here." (*Ibid.*) The court explained, "the trial record contains evidence that defendant's employee and guard . . . was aware of facts that led him to conclude, at least a few minutes prior to the occurrence of the assault (and prior to plaintiff's departure from the bar), that a fight was likely to occur[.]" (*Ibid.*)

The same analysis applies here. Madrigal and his friends, already intoxicated, had altercations with Kauvaka earlier in the night, and it was thus foreseeable that as the night proceeded and if, as likely, they drank more alcohol, an assault would occur. Raincross contends Madrigal did not plead this theory, did not develop it in the trial court, and has disclaimed it in his opening brief. But as stated, we review a summary judgment de novo; therefore, we assess all of the evidence before the trial court and make an independent determination of its effect as a matter of law.

The other issues of breach, causation and damages are for a jury to decide. "Whether the security guard acted reasonably under the circumstances and whether his acts were a substantial factor in causing [Madrigal's] injuries are questions of fact to be resolved by trial, not summary judgment." (*Trujillo v. G.A. Enterprises, Inc.* (1995) 36 Cal.App.4th 1105, 1108-1109 [a security guard saw a group of youths surround the victim in a fast food restaurant and witnessed threats to the victim; although the guard did remove a girl who took a swing at the victim, he did not extricate the

23

victim from the threatening situation, tell the threatening group to leave, immediately call the police or return quickly to quell the disturbance].)

## DISPOSITION

The judgment is reversed.  Madrigal is awarded costs on appeal.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.